IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Carolyn Johnson, *on behalf of JJG*, | ) | Civil Action No. 6:12-1139-RBH-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her son's claim for supplemental security income benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for supplemental security income ("SSI") benefits on May 22, 2008, on behalf of the claimant, JJG, a child under the age of 18, with an alleged disability onset date of April 3, 2008. The application was denied initially on August 20, 2008, and on reconsideration on January 20, 2009. On February 18, 2009, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

and JJG, along with their attorney, appeared on August 19, 2010, considered the case *de novo*, and on September 2, 2010, found that JJG was not disabled under section 1614(a)(3)(C) of the Social Security Act. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on February 24, 2012. The plaintiff then filed this action for judicial review.

In making his determination that JJG is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant was born on July 29, 1995. Therefore, he was an adolescent on May 2, 2008, the date the application was filed, and is currently an adolescent (20 C.F.R. § 416.926a(g)(2).

(2)    The claimant has not engaged in substantial gainful activity since May 2, 2008, the application date (20 C.F.R. §§ 416.924(b) and 416.971 *et seq.*).

(3)    The claimant has had the following severe impairments: attention deficit hyperactivity disorder and oppositional defiant disorder (20 C.F.R. § 416.924(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924(d), 416.925, and 416.926).

(5)    The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 C.F.R. §§ 416.924(d) and 416.926(a)).

(6)    The claimant has not been disabled, as defined in the Social Security Act, since May 2, 2008, the date the application was filed (20 C.F.R. § 416.924(a)).

2

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

For purposes of eligibility for Title XVI children's disability benefits, an individual under age 18 will be considered disabled if he has a "medically determinable physical or mental impairment or combination of impairments that causes marked and severe functional limitations, and that can be expected to cause death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.906; *see also* 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner's regulations establish a three-part evaluation process: (1) determine whether the child is currently engaged in substantial gainful activity. If so, he is not disabled; if not, (2) determine whether the child has a severe impairment or impairments. If not, he is not disabled; if so (3) determine whether the child's impairments meet, medically equal, or functionally equal any impairment listed at 20 C.F.R. pt. 404, subpt. P, app.1 (the Listings). If not, he is not disabled.  20 C.F.R. § 416.924(b)-(d).  If the claimant's impairment or combination of impairments does not meet or medically equal the requirements of a Listing, the Commissioner will decide whether it results in limitations that functionally equal such requirements.  *Id.* § 416.926a(a). To assess functional equivalence, the Commissioner considers how the claimant functions in activities in terms of six domains, broad areas of functioning intended to capture all of what a child can or cannot do.  *Id.* § 416.926a(b)(1). These domains are:  (1)  acquiring and using information, (2)  attending and completing tasks, (3)  interacting and relating with others, (4)  moving about and manipulating objects, (5)  caring for oneself, and (6)  health and physical well being. *Id.*

To establish functional equivalence, the claimant must have a medically determinable impairment or combination of impairments that results either in "marked"

3

limitations in two domains or an "extreme" limitation in one domain. *Id.* § 416.926a(a). The Commissioner will find that a claimant has a "marked" limitation in a domain when the claimant's impairment or combination of impairments interferes seriously with her ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme" and may arise when several activities or functions are limited or when only one is limited. *Id.* The Commissioner will find that the claimant has an "extreme" limitation in a domain when the claimant's impairment or combination of impairments interferes very seriously with his ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). Extreme limitation also means a limitation that is "more than marked" and may arise when several activities or functions are limited or when one is limited. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his

4

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff alleges JJG has been disabled since April 3, 2008, at which time he was 12 years old.

### Medical Evidence

On March 10, 2008, JJG saw Lawrence Mauldin, M.D., for treatment. JJG had good attention and concentration and good memory (appropriate for his age). Dr. Maudlin diagnosed attention deficit disorder and treated JJG with medication (Concerta) (Tr. 219-22).

In early April 2008, psychiatrist Timothy Malone, M.D., admitted JJG to a mental health inpatient treatment program for increasingly disruptive behavior at school (Tr. 223). JJG was suspended after posing for a picture in the girls' bathroom. JJG reported to Dr. Malone that his mood was good, but his mother said that he was moody and irritable. Both JJG and his mother denied any symptoms of depression (Tr. 223). His mother reported normal social interactions with his friends. Dr. Malone indicated that, on a mental status examination, JJG was calm and cooperative and had normal speech, no symptoms of anxiety, normal memory, and no abnormal movements (Tr. 224).

During his week-long course in the hospital, JJG did not exhibit any symptoms of inattention, but he exhibited many symptoms of oppositional-defiant behavior (Tr. 225). On the Conners Continuous Performance Test-II, which measures a person's sustained and selective attention and impulsivity, JJG obtained abnormal results in only one of the 12 areas tested. Dr. Malone indicated that "[t[he chances are only 50/50 that [JJG] has problems with attention" (Tr. 227). Dr. Malone added a medication to JJG's treatment regimen (Risperdal) to target his moodiness, irritability, and aggressiveness. After starting

5

the Risperdal, JJG's mood and behavior improved (Tr. 225). At discharge, his diagnoses were oppositional-defiant disorder ("ODD"), history of learning disability, history of attention deficit hyperactivity disorder ("ADHD"). JJG had a Global Assessment of Functioning ("GAF")[3] of 50 on admission and 65 on discharge (Tr. 223).

On followup in mid-April and late-April 2008, Dr. Malone indicated JJG's mental status examinations were normal (Tr. 235-36).

In July 2008, JJG saw Lesley Foulkes-Jamison, Ph.D., for a psychological evaluation in relation to his application for disability benefits. JJG's mother indicated that she believed that JJG's medication regimen effectively managed his behavioral and attention deficits. After IQ and achievement testing, Dr. Foulkes-Jamison noted that, although JJG was a rising seventh grader, his academic skills were at the fourth to fifth grade level, and he would require remediation in reading, writing, and math. Dr. Foulkes-Jamison noted that JJG's overall thinking and reasoning abilities exceeded only eight percent of children his age and that he had particular difficulty on tasks requiring psychomotor speed. She noted that his overall cognitive ability was within the borderline range of intellectual functioning with low average verbal reasoning and average perceptual reasoning ability. Dr. Foulkes-Jamison diagnosed ADHD (predominantly inattentive type), ODD (by history), and learning disorder NOS (poor psychomotor speed) (Tr. 249-53).

In August 2008, state agency psychologist Edward Waller, Ph.D., reviewed the records and assessed JJG's mental condition. Dr. Waller considered JJG's ADHD,

---

[3]A GAF score of 41-50 indicates a person has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with peers or co-workers)." A GAF score of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed. text revision 2000).

ODD, and disruptive behavior, but he found that JJG's condition did not meet, medically equal, or functionally equal any of the listed impairments. Dr. Waller indicated that JJG had no limitation in three of the six functional domains (moving about and manipulating objects, caring for self, and health and physical well-being). Dr. Waller found that JJG had less than marked limitations in the domains of acquiring and using information and attending and completing tasks. Finally, he found JJG had marked limitations in the domain of interacting and relating with others. In support, he cited JJG's hospitalization for disruptive behavior and JJG's improvement with medications. He also cited to the July 2008 reports of JJG's mother that JJG was doing better on medications, his behavior was improved, and his teacher reported that he was doing better at the end of the school year (Tr. 254-59).

JJG was evaluated in the emergency room on October 8, 2008, for worsening behavior at home and at school, including increased aggressiveness towards friends and family members (Tr. 267-68). Dr. Timothy Malone admitted JJG to Palmetto Health Baptist Medical Center on the diagnosis of ADHD on that same date. Dr. Malone note that JJG was being admitted for "poor impulse control" further characterized as "out of control behavior and threatening behavior at home and school" (Tr. 165). JJG admitted that he had smoked marijuana at a family member's house, but he acknowledged that this was an unhealthy choice. He was continued on Concerta and his prescription for Risperdal was increased. JJG responded well to this change and reported that he was not overly sedated during the day, and he did not complain of side effects (Tr. 263). On discharge after a week, Dr. Malone diagnosed ADHD, ODD, and marijuana abuse. The plaintiff's GAF upon discharge was 55 (Tr. 264).

On followup in September and December 2008, Dr. Malone again indicated that JJG's mental status examinations were normal (Tr. 277-78).

In January 2009, state agency psychologist Lisa Klohn, Ph.D., reviewed the records and assessed JJG's mental condition (Tr. 280-85). Dr. Klon considered JJG's

7

ADHD, ODD, disruptive behavior, marijuana abuse, and learning disorder, but she found that JJG's condition did not meet, medically equal, or functionally equal any of the listed impairments (Tr. 280). Dr. Klohn indicated that JJG had no limitation in two of the six functional domains (moving about and manipulating objects and health and physical well-being). Dr. Klohn found that JJG had less than marked limitations in three other domains (acquiring and using information, attending and completing tasks, and caring for self). Finally, she found JJG had marked limitations in the domain of interacting and relating with others (Tr. 282-83). In support, Dr. Klohn noted that JJG had been hospitalized for ADHD and ODD, but his treating psychiatrist stated he was doing well on his current medications. Dr. Klohn found that, although JJG experienced some limitations, they were not severe enough to render him totally disabled (Tr. 285).

On followup in March and May 2009, Dr. Malone indicated that JJG's mental status examinations were normal. Notes indicate that JJG was expelled from school, and it was uncertain whether he would be permitted to return (Tr. 286-87).

Columbia Area Mental Health Center initially evaluated JJG on June 2, 2009 (Tr. 294-303). Clinician Gary Stuckey, M.Ed., LPC reported that JJG was unsure what was causing his problems stating, "I do have a temper, but it's a lot better now with the medicine, it takes a lot more to make me mad now than it used to." He reportedly indicated that he did get in trouble sometimes and was punished, felt unable to do things he wanted, but did not know how to solve these problems (Tr. 294). Mr. Stuckey stated that the risk assessment did not indicate that JJG displayed any urgent needs as he was not suicidal, homicidal, self-mutilating, or engaging in any other high risk behaviors (Tr. 295). Mr. Stuckey noted that JJG's affect appeared blunted and that he seemed to have only an average fund of knowledge, but seemed to be within normal limits in every other area (Tr. 301- 302). His interpretive summary included that JJG would likely benefit from family therapy to help improve communications between himself and his mother and for them to

8

become more mutually respectful (Tr. 303). Mr. Stuckey added that JJG would likely benefit from continued individual therapy for building skills to use to improve his interactions with others and minimize the frequency of disrespectful and defiant behavior.  JJG and his mother agreed with this plan.  Mr. Stuckey's diagnosis was as follows: OPP, ADHD (mixed type) (criteria for diagnosis included poor concentration, distractibility, dislikes complicated tasks, talks and interrupts others, difficulty waiting, often loses temper, argues with adults, lies, steals, disrespectful, defiant, blames others for mistakes, easily annoyed, angry and resentful, oppositional).  Mr. Stuckey further stated that the plaintiff's GAF was 54 (Tr. 303).

On August 24, 2009, Dr. Dorothy J. Park (ophthalmologist) diagnosed JJG with a chalazion[4], suspected glaucoma (low), and history of trauma to the eye wall.  The plan was to monitor the plaintiff with a yearly examination, along with warm compresses and antibiotics to remove the chalazion (Tr. 321).

In a progress summary dated November 15, 2009, Mr. Stuckey reported that JJG had made only limited progress toward his treatment goals, as his mother had to call the police because of his defiant behavior and he was expelled from school and relocated because of his aggressive behavior towards his peers.  Mr. Stuckey indicated that he had met JJG five times since June 2009 and that while JJG had been pleasant and cooperative during their sessions, he also made it "quite clear" that he had little intention of being more respectful to his mother or trying to follow rules.  He noted that JJG's mother still wanted him placed in a residential facility.  Mr. Stuckey reported that based on the CALOCUS Assessment performed on JJG, he was not appropriate for residential treatment.  Mr. Stuckey concluded that he believed some type of home intervention would have to occur in order to help JJG and his mother cooperate with each other (Tr. 325).

---

[4]"A chalazion is a small bump in the eyelid caused by a blockage of a tiny oil gland." *See* http://www.nlm.nih.gov/medlineplus/ency/article/001006.htm

Dr. Claytor refilled JJG's Risperdal and Concerta on December 1, 2009, noting that JJG was transferred to an alternative school after fighting at his previous school (Tr. 324). Mr. Stuckey saw JJG in followup the next day reiterating that he had made little progress toward his treatment goals and that his mother had to call the police on him more than once (Tr. 342). Mr. Stuckey opined that JJG was at serious risk of needing further hospitalization and of Department of Juvenile Justice ("DJJ") involvement because of his behavior problems.

Mr. Stuckey saw JJG in followup on March 3, 2010, noting that he continued to struggle with maintaining appropriate behavior and was on house arrest where he continued to exhibit oppositional behavior and refused to take his prescribed medications. Mr. Stuckey opined that JJG remained at a significant risk for further involvement with DJJ and for expulsion from school (Tr. 342). In a letter dated March 29, 2010, Mr. Stuckey reported that JJG had "actively participated" in therapy, but had been "fairly noncompliant" in taking his prescribed medications (Tr. 346). He expressed great concern about the level of defiance JJG displayed, noting that he was more agitated and uncooperative than he had ever seen him before. He opined that JJG seemed unable to acknowledge the seriousness of his situation. Mr. Stuckey expressed worry that JJG's failure to take responsibility for his actions would result in further involvement of the juvenile justice system.

### School and Court Records

JJG had a history of behavioral problems at school. In early 2008, he was suspended on several occasions for using profanity, kicking another student, and posing for inappropriate photographs (Tr. 241-43). However, his grades were mostly Bs and Cs during the same time period (Tr. 240). The school provided plaintiff with resource support classes and a behavioral intervention plan (Tr. 308), and JJG's curriculum followed an annually-tailored Individualized Education Program ("IEP") (Tr. 150-64, 193-208).

Ms. Small of Longleaf Middle School completed a Teacher Questionnaire dated December 16, 2008 (Tr. 124-132). Ms. Small indicated that she had known JJG for one and a half years, saw him daily, and taught him Language Arts. Ms. Small reported that JJG's actual grade level was seventh. He was reading, writing, and performing arithmetic below average, but was not absent from school to an unusual degree (Tr. 124). Ms. Small indicated that JJG had problems functioning in the domain of acquiring and using information, often needing classroom directions repeated, displayed difficultly comprehending "on-grade level" content particularly in Science and Social Studies, and required one-on-one interaction when introduced to new math concepts (Tr. 125). Under the domain of attending and completing tasks, Ms. Small indicated that JJG had even more serious problems functioning and noted that his behavior plan required teachers to facilitate organization using a "one-binder system." She stated that JJG required extra time to complete assignments and was tested in small groups (Tr. 126). Ms. Small explained that JJG also exhibited functional limitations in the domain of interacting and relating with others. She noted that there was a behavior intervention plan in place that included a behavior "contract" involving communication with JJG's parents (Tr. 127). She indicated that JJG exhibited no difficulties functioning in the domain of moving about and manipulating objects, but was functionally limited in the domain of caring for himself (Tr. 129). She noted he did not always seek out help, ask questions, or participate much in a larger classroom setting. Ms. Small indicated that JJG exhibited difficulty regulating his emotions. Ms. Small reported that JJG took medication regularly, but did not frequently miss school because of illness (Tr. 130). Ms. Small additionally commented that JJG was a capable student if he used the resources that were available to him. She concluded by stating she had seen glimpses of JJG improving and regressing (Tr. 131).

In April 2009, Dr. Kellie M. Martin, a school psychologist, administered a battery of psycho-educational tests to JJG, who was then 13 years old (Tr. 306-19). Dr.

11

Martin reported that JJG's results from the Weschler Intelligence Scale for Children, Fourth Edition ("WISC-IV") indicated that his general level of intellectual functioning fell within the low average range including his ability to respond quickly and accurately to tasks, to read (both decode words in isolation and comprehend), to write, and perform basic calculation skills (Tr. 310-11). She noted that JJG's ability to reason with mathematical material was extremely low for his age and that his greatest weakness involved his working memory (ability to listen to, manipulate, and recite information). He performed in the average range on the remaining tasks included in this particular test. According to the results from the Behavioral Assessment System for Children, Second Edition ("BASC-II"), JJG displayed at-risk to clinically significant externalizing behavior across home and school including hyperactivity, depression, and difficulty adapting (Tr. 312). Dr. Martin noted that according to the results of *Conners' Rating Scales – Revised*, JJG showed atypical levels of oppositional behavior indicating his needs were broader than what could be explained by ADHD alone (Tr. 312-13). Dr. Martin concluded that JJG continued to meet the eligibility criteria of a student with a learning disability and recommended to the District's Placement Committee that he be considered additionally eligible as a student with an emotional disability (with either being primary or secondary) as he exhibited these characteristics to a marked degree, which adversely affected his educational performance (Tr. 313).

On December 3, 2009, the South Carolina Family Court issued JJG a summons indicating a petition had been filed charging him with being an "Incorrigible Child" and demanding his and his mother's presence before the court on February 17, 2010 (Tr. 146). The petition, dated December 1, 2009, indicated that JJG committed the offense of "Runaway" on or about November 6, 2009, in the presence of witnesses (Tr. 147). It also stated that he committed the offense of "Incorrigible" on or about February 27, 2009, when he disrespected and disobeyed his mother during football and took money out of her pocket without permission. Additionally, JJG was accused of pushing another child in a ditch in

front of witnesses (Tr. 148).  The court adjudicated JJG delinquent of the offenses and ordered that he be under the supervision of the DJJ (for assessment, alternative schooling, and monitoring of JJG's compliance with the court-ordered terms of probation) (Tr. 175-78).

In April 2010, when JJG was in the eighth grade, three of his teachers completed questionnaires as to his overall functioning (Tr. 166-73 (home room and language arts teacher); Tr. 180-85 (social studies teacher); Tr. 186-91 (science teacher)). The social studies teacher indicated that he was not absent to an unusual degree and he exhibited obvious problems comprehending oral instructions, understanding school content and vocabulary, providing organized oral explanations and adequate descriptions, learning new material, and recalling and applying previously learned material (Tr. 180-185).  The teacher commented that JJG often received help from classmates, making it difficult to determine how well he actually comprehended certain information.  It was noted that he had serious problems comprehending written material, expressing ideas in written form, and applying problem-solving skills in class discussions. The teacher indicated that JJG exhibited very serious problems with organizing his own things and completing class/homework assignments, serious problems with focusing long enough to finish assigned activity or task, carrying out multi-step instructions, and completing work accurately without careless mistakes (Tr. 182).  Obvious problems were noted in his ability to seek attention and express anger appropriately, follow rules, and respect and obey adults. The teacher noted that he had no problems moving about and manipulating objects (Tr. 183-84).  However, the teacher did report that JJG exhibited serious problems handling frustration appropriately, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, and responding appropriately to changes in his own mood (Tr. 185).

JJG's science teacher concurred that JJG often relied on help from other students and did not attempt to figure out difficult material on his own (Tr. 187-89).  The

teacher indicated that JJG had obvious problems with completing class and homework assignments, completing work accurately without careless mistakes, following rules, handling frustration appropriately, and responding appropriately to changes in own mood, but he had only slight or no problem in other activities (Tr. 187-91).

JJG's homeroom and language arts teacher, Pam Sanders, R.N., reported (Tr. 166-73) that JJG exhibited obvious problems in the following areas:  comprehending oral instructions, understanding school and content vocabulary, comprehending and performing math, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and applying problem solving skills in class discussions (Tr. 167).  She noted that he had a short attention span, exhibited oppositional defiant behavior, and required continuous prompting to complete work.  Nurse Sanders indicated that JJG had a serious problem working at a reasonable pace, completing work accurately without careless mistakes, completing class/homework assignments, changing from one activity to another without being disruptive, and carrying out multi-step instructions (Tr. 168).  She reported obvious problems in his ability to pay attention when spoken to directly, focusing long enough to finish assigned activity or task, organizing his own things or school materials, and working without distracting himself or others.  She reported that JJG exhibited very serious problems with seeking attention appropriately, expressing anger appropriately, and relating experiences and telling stories.  Nurse Sanders reported that he exhibited serious problems asking permission appropriately, following rules, respecting/obeying adults in authority, using language appropriate to situation and listener, and using adequate vocabulary and grammar to express thoughts/ideas in general every day conversation (Tr. 169).  In the domain of caring for yourself, Nurse Sanders noted that JJG had serious problems with handling frustration appropriately, being patient when necessary, responding appropriately to changes in his own mood and a very serious problem cooperating in or being responsible

for taking needed medications (Tr. 171). She reported that he took Concerta and Risperadol, but was unsure if he took these medications on a regular basis (Tr. 172). Nurse Sanders noted that JJG did not frequently miss school due to illness and made visits to the health room to avoid being in class (Tr. 172).

The DJJ issued an IEP dated May 13, 2010, in which it was noted that JJG would spend eighty to one hundred percent of his time in a regular educational environment (Tr. 193-207). According to the results of the California Achievement Test, JJG read one year below assigned grade level, computed three years below assigned grade level, had expressed basic knowledge regarding school to work transition, but needed additional practice with employment applications and employment interviews. It was noted that JJG was currently adjudicated to the South Carolina DJJ Midlands Evaluation Center due to antisocial behavior. It was reported that he needed special education support services to improve his reading comprehension, writing, mathematical, study and test-taking, personal and social behavioral skills, and employment readiness skills (Tr. 195).

### Hearing Testimony

At the hearing, JJG's mother, who is the plaintiff in this case, testified that her son did not perform at the same level as other children his age due to ADHD and ODD, as well as a learning disability and an emotional disability (Tr. 33). She said that JJG would become angry and have tantrums, but he did not beat other children (Tr. 36). She said that medications helped his ADHD and ODD (Tr. 33). She also said that a hands-on educational camp with the DJJ also helped JJG (Tr. 34-36). The plaintiff testified that Dr. Claytor was JJG's psychiatrist and Mr. Stuckey was his counselor (Tr. 43). She stated that Dr. Claytor focused on JJG's medication regimen and strongly encouraged him to take it as directed. The plaintiff testified that JJG reported side effects including increased heart rate, appetite loss, and increased grogginess in the mornings (Tr. 42-43). She confirmed that she had met with JJG's teachers regarding his school performance who reportedly

15

focused most heavily upon JJG taking his medications (Tr. 44).  The teachers reported that JJG was better able to focus when he took his medication.  She testified that JJG required redirection at school and that there was a behavior plan in place that included his removal from class if necessary (Tr. 44-45).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1)  failing to consider all of JJG's documented impairments at all steps of the sequential evaluation process for determining childhood disability and (2)  violating Social Security Ruling ("SSR") 09-1P in assessing functional equivalence.  The plaintiff further argues that the court should issue a dual remand under sentences four and six of 42 U.S.C. § 405(g).

### *Consideration of All Impairments*

The plaintiff first argues that the ALJ erred by failing to properly consider all of JJG's documented impairments at all steps of the sequential evaluation process. Specifically, the plaintiff argues that the ALJ erred at step two by failing to consider JJG's learning disorder, borderline intelligence, eye condition involving suspected glaucoma, and past history of seizure disorder.  For an individual who has not attained age 18, an impairment that "is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not severe. 20 C.F.R. § 416.924(c).  At step two, the ALJ found that JJG had the following severe impairments: ADHD and ODD (Tr. 14).

The evidence before the court shows that JJG had a seizure disorder during infancy for which he took Dilantin.  It was noted that his last seizure occurred when he was eight years old, approximately four years prior to his alleged disability onset date (*see* Tr. 224).  Also, in August 2009, after an eye exam, Dr. Park assessed JJG with suspected glaucoma (low) (Tr. 321).  The plaintiff has failed to show any evidence that the suspected

16

glaucoma or history of seizure disorder caused any functional limitations whatsoever for JJG.  Thus, the ALJ did not err in failing to find these were severe impairments.

With regard to JJG's learning disorder and borderline intelligence, as argued by the Commissioner, whether the ALJ found that these impairments were severe or non-severe is not dispositive because the combined effects of all impairments, both severe and non-severe, must be taken into consideration at subsequent steps of the sequential evaluation. *See* 20 C.F.R. § 416.926a(a) ("When we make a finding regarding functional equivalence, we will assess the interactive and cumulative effects of all of the impairments for which we have evidence, including any impairments you have that are not 'severe.' "). As a result, if an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless since the ALJ "reached the proper conclusion that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence"); *see also Shuler v. Colvin*, C.A. No. 1:12-cv-2083-RBH, 2013 WL 2241479, at *5 (D.S.C. May 21, 2013) (finding no error at step two where the ALJ did not find an impairment severe as the impairment was considered in subsequent steps) (citing *Carpenter*, 537 F.3d at 1266).

Here, the ALJ specifically stated that, in determining JJG's functional limitations, he "assessed the interactive and cumulative effects of all of [JJG's] medically determinable impairment(s), including any impairments that are not 'severe'" (Tr. 14). Moreover, the ALJ engaged in a detailed discussion of JJG's medical and school records and specifically considered his learning disorder and borderline intelligence in determining JJG's functional limitations (Tr. 15-17).  Based upon the foregoing, the plaintiff's allegation of error at step two is without merit.

The plaintiff further argues that the ALJ erred at step three by failing to conduct a complete listing analysis.  The ALJ summarily stated that the claimant did not have an impairment or combination of impairments that met or medically equaled a listed impairment and then went on to discuss at length whether JJG's impairments functionally equaled a listing (Tr. 14-22).  While the ALJ should have identified the relevant listing and provided an analysis, the undersigned agrees with the Commissioner that because the ALJ's analysis later in the decision provided an explicit, definitive basis for rejection of the relevant listing's criteria, the error is harmless.  Harmless error analysis is appropriate "to supply a missing dispositive finding ... where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Fischer–Ross v. Barnhart*, 431 F.3d 729, 733–34 (10th Cir. 2005). *See Stevenson v. Astrue*, C.A. No. 8:10-cv-1565-DCN, 2011 WL 4501914, at *3-5 (D.S.C. Sept. 28, 2011) (finding that because ALJ made specific findings later in the decision that conclusively negated the possibility that the claimant met a particular listing's criteria, the ALJ's failure to do appropriate analysis at step three was harmless) (citing *Fischer-Ross*, 431 F.3d at 733-34).

The plaintiff argues that the ALJ should have considered Listings 112.04 (Mood Disorders), 112.11 (ADHD), and 112.02 (Organic Mental Disorders).  The Paragraph B criteria of Listing 112.11 (ADHD) requires, for children age 3 to 18, marked impairment in at least two of the following: age-appropriate cognitive/communicative function; age-appropriate social functioning; age-appropriate personal functioning; or maintaining concentration, persistence, or pace.  20 C.F.R. pt. 404, subpt. P, app. 1 § 112.11.  In a detailed discussion, the ALJ found that JJG had marked limitation in interacting and relating with others, but less than marked limitations in acquiring and using information, attending and completing tasks, and caring for self (Tr. 14-22).  Thus, these findings conclusively

18

preclude the possibility that the plaintiff had a marked impairment in at least two areas as would be required for JJG to meet or medically equal Listing 112.11 (paragraph B criteria). Furthermore, as explained below, these findings were well-articulated and supported by substantial evidence.

The plaintiff also argues that JJG's condition may have met or medically equaled Listings 112.02 (Organic Mental Disorders)[5] and 112.04 (Mood Disorders)[6] (pl. brief at 23-24). However, this court agrees with the Commissioner that there was no evidentiary basis to consider Listings 112.02 (as JJG's last seizure was four years before his onset date at about age eight) or 112.04 (although the record contained a few mentions of depression, generally JJG and his mother reported no symptoms of depression). Furthermore, it appears that his ODD would most appropriately be evaluated under Listing 112.11. *See Jones v. Astrue*, No. 3:09-cv-00676, 2010 WL 5110086, at *6 n.3 (S.D. W.Va. Dec. 9, 2010) (Listing 112.11 "undoubtedly was the appropriate comparison" for claimant's ADHD and ODD). Furthermore, the plaintiff has failed to identify medical findings that could arguably

---

[5]   Listing 112.02 (Organic Mental Disorders) provides as follows in the introductory statement:

Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously required functional abilities.

20 C.F.R. pt. 404, subpt. P, app. 1 § 112.02.

Moreover, the Paragraph B criteria of Listing 112.11 (ADHD) specifically requires "at least two of the appropriate age-group criteria in paragraph B2 of [Listing] 112.02." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.11. As the Paragraph B criteria of Listings 112.02 (Organic Mental Disorders) and 112.11 (ADHD) are identical, the ALJ's findings also conclusively precluded the possibility that the plaintiff had a marked impairment in at least two areas as would be required for JJG to meet or medically equal Listing 112.02.

[6]Listing 112.04 (Mood Disorders) provides in the introductory statement that it is "[c]haracterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. pt. 404, subpt. P, app. 1 § 112.04.

19

meet the specific criteria of these listings. Based upon the foregoing, this allegation of error is without merit.

### SSR 09-1P

The plaintiff next argues that the ALJ erred by violating SSR 09-1p in assessing functional equivalence. SSR 09-1p consolidates the applicable regulations and explains the Commissioner's "whole child" approach for determining whether a child's impairment(s) functionally equals a listing. It identifies six broad domains of functioning "intended to capture what a child can or cannot do" as follows:

1. Acquiring and using information;

2. Attending and completing tasks;

3. Interacting and relating with others;

4. Moving about and manipulating objects;

5. Caring for yourself; and

6. Health and physical well-being.

SSR 09-1p, 2009 WL 396031, at *1; *see* 20 C.F.R. § 416.926a(b)(1). Under the "whole child" approach, the Social Security Administration begins "by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments." *Id.* at *2. Next, the domains are used "to create a picture of how, and the extent to which, the child is limited by identifying the abilities that are used to do each activity, and assigning each activity to any and all of the domains involved in doing it." *Id.* The next consideration is whether the child's medically determinable impairment(s) account for the limitations that have been identified. *Id.* Finally, the overall severity of limitation in each domain is rated. *Id.* As argued by the Commissioner, the ALJ specifically utilized the "whole child" approach (Tr. 14-22).

Disability is established if a child has marked limitations in at least two of the six domains or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d). "[A] marked

20

limitation in a domain [occurs] when [a claimant's] impairment(s) interferes seriously with [their] ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). An "extreme" limitation interferes "very seriously" with a claimant's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i). The ALJ concluded that JJG only exhibited a marked limitation in his ability to interact and relate with others (Tr. 20). The ALJ further found that JJG had less than marked limitations in the first, second, and fifth domains and no limitations in the fourth and sixth domains (Tr. 14-22). The plaintiff argues that the "substantial evidence of record supports the contention that [JJG] has marked to extreme functional limitations in at least four, possibly five of the domains. The only domain in which [he] does not have a limitation is in Moving About and Manipulating Objects" (pl. brief at 28).

Substantial evidence supports the ALJ's findings as to the severity of JJG's limitations in each domain. As Dr. Klohn noted, JJG experienced some limitations, but these limitations were not severe enough to render him totally disabled (Tr. 285). Notably, both JJG and his mother reported that his condition improved with medications and treatment. JJG generally made Bs and Cs and, with the exception of math, his academic skills were in the low average range (first domain) (Tr. 313). Although JJG had a short attention span, he had no problem or only slight problems with carrying out single-step instructions and paying attention when spoken to (second domain) (Tr. 168, 182, 188). While JJG had difficulty with anger and behavioral problems, he was generally not violent toward others, and he improved on medication (third domain) (Tr. 36, 225, 249-53, 254-59, 263, 285, 294, 337). He was a skilled athlete (fourth domain), and he did not have any repeated physical health problems (sixth domain). Aside from not always taking his medications, he generally cared for himself well, presenting to treating sources in a calm and neat manner (fifth domain). As the ALJ's findings are supported by substantial evidence, this allegation of error is without merit.

21

***Sentences Four and Six Remand***

Lastly, the plaintiff argues that the case should be remanded under sentences four and six of the Social Security Act (pl. brief at 28-30).  Judicial review of any final decision by the Commissioner is authorized, and limited, by the Social Security Act. *See* 42 U.S.C. § 405(g). Section 405(g) *only* permits two types of remands:  (1)  remands pursuant to the fourth sentence; and (2)  remands pursuant to the sixth sentence. *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).

Under sentence four, a court may remand a case after passing on its merits and issuing judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g).  In passing upon the merits of the case, the court may only consider the pleadings and the administrative record. *Id.*; *see also Huckabee v. Richardson,* 468 F.2d 1380, 1381 (4th Cir. 1972).  As the ALJ's decision is supported by substantial evidence and without legal error as discussed above, the court should deny the plaintiff's request for a sentence four remand.

Under sentence six, a court may remand a case if the plaintiff shows "that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . . " 42 U.S.C. 405(g). Remand on the basis of new evidence is appropriate if:  1)  the evidence is relevant to the determination of disability at the time the application was first filed; 2)  the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; 3)  there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and, 4)  the claimant made at least a general showing of the nature of the new evidence to the

22

reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir.1985)[7] (citing 42 U.S.C. § 405(g)).

In requesting a sentence six remand, the plaintiff identifies two record references that show additional evidence *might* exist: a reference to the fact that JJG may have had disability benefits in the past at age nine (pl. brief at 28-29 (citing Tr. 110)) and a reference to the fact that there may have been more DJJ records in existence (*id.* at 29 (citing Tr. 45)).  As argued by the Commissioner, as a threshold matter, the plaintiff is seeking a sentence six remand based upon the *hypothetical* existence of the above-described new evidence.  The plaintiff has not proffered either of these pieces of evidence.  Moreover, the plaintiff has not shown good cause for failing to submit the evidence to the ALJ.  The plaintiff references the transcript of the hearing where the ALJ stated that the plaintiff's attorney had mentioned that she "might have some records from the Department of Juvenile Justice that have not arrived yet . . . ." (Tr. 45).  The ALJ stated that he was not going to hold the case open, but he would be glad to look at any other information the attorney provided prior to the issuance of the decision (*id.*).  As argued by the Commissioner, the hypothetical evidence described by the plaintiff, if it exists, would have existed long before the close of the administrative proceedings and could have been produced then.  Based upon the foregoing, the district court should deny the plaintiff's request for a sentence six remand.

---

[7] "Though the court in *Wilkins* [*v. Sec'y of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991)] indicated in a parenthetical that *Borders*' four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09–1107, 2010 WL 3199345, at *3 n. 4 (D. Md. Aug.12, 2010) (citing cases).  *See Elkins v. Astrue*, C.A. No. 4:10-2648-TER, 2012 WL 602779, at *4 n.3 (D.S.C. Feb. 24, 2012).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 2, 2013                                    s/ Kevin F. McDonald
Greenville, South Carolina                     United States Magistrate Judge

24